UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                   :

OSMOND BROWN,                      :
                                   :

               Plaintiff,       :

                                   :          02 Civ. 7985 (GEL)

        -against-          :

                                   :        **OPINION AND ORDER**

JOHN SNOW, Secretary of the Treasury,  :

                                 :

              Defendant.     :

                                   :
---------------------------------------------------------------x

Ambrose Wotorson, Law Offices of Ambrose
Wotorson, P.C., Brooklyn, NY, for Plaintiff.

David N. Kelley, United States Attorney for the
Southern District of New York (Joseph A. Pantoja,
Assistant United States Attorney), for Defendant.

GERARD E. LYNCH, District Judge:

      Plaintiff Osmond Brown, an African-American immigrant born in Costa Rica, brings this

employment discrimination action against his employer, the Internal Revenue Service ("IRS"),

through the Secretary of the Treasury John Snow.  Brown claims that since June 2000, he has not

received work commensurate with his pay grade, has not received assignments above his pay

grade for career development purposes, and has not been promoted to a higher pay grade, all

because of his race and national origin and in retaliation for his prior complaints of

discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

("Title VII").  Defendant now moves for summary judgment, arguing, *inter alia*, that Brown has

not exhausted administrative remedies with respect to some claims, that the claimed violations

are not actionable under Title VII, and that the evidence does not raise an inference of

discrimination or retaliation.  For the reasons below, defendant's motion will be granted.

## BACKGROUND

Unless otherwise noted, the following facts are admitted by both parties pursuant to Local Rule 56.1.[1]  Brown has worked for the IRS for the past twenty-five years.  Within the IRS, the salaries and duties of employees are determined by the government pay scale, with employees of higher "grades" earning more money and undertaking more demanding work than lower-graded employees.  Beginning in June 2000, Brown was a grade 12 agent assigned to Group 1645 in the Large and Mid-Size Business Division ("LMSB") of the IRS, a newly created division which dealt with corporate taxpayers with at least $5 million in assets.  Brown's job as an agent was to review and examine corporate tax returns.  Group 1645 was composed exclusively of grade 12 agents – including Brown, along with agents Morgenstern, Gill, Pong, Gelin, Monachino, Chapman, and Caba – and was managed by Thomas Chillemi.  Chillemi's manager was Paul Rinaldi, Territory Manager for the Manhattan District.  Work within the group was assigned by geographic location, what the IRS refers to as "post of duty" or "POD," with each agent responsible for returns from a specific area.[2]  Brown's POD was Bardonia, a town in

_____

[1] "All material facts set forth . . . by the moving party will be deemed to be admitted unless controverted by the . . . opposing party. " Local R. 56.1(c).

[2] Brown denies this assertion.  (Pl. Rule 56.1 Stmt. ¶ 11.)  However, the denial is based on his claim that he was not given the same work that others in the group were given.  Brown does not provide any evidence to controvert defendant's assertion to the extent that the assertion is one of official administrative policy.  The only record citations provided by Brown are to Chillemi's deposition transcript (Chillemi Dep. 120) and the notes Chillemi took after speaking with an Equal Employment Opportunity representative in September 2000 (Wotorson Decl. Ex. 6).  Both citations relate to Chillemi's supposed admission that prior to a complaint by Brown in September 2000, Brown was not assigned any grade 13 returns.  Neither document is relevant to the issue of how PODs relate to case assignments.

Rockland County, New York. Other agents in Group 1645 were assigned to PODs in White Plains and Manhattan.

Returns were also assigned based on "activity codes." Each return was given an activity code based on the "asset base" of the taxpayer and whether the corporation was taxable or non-taxable. So, for example, a taxable corporate return in which the taxpayer claimed an asset base between $1 million and $5 million was assigned code 215; a taxable corporate return with an asset base between $5 million and $10 million was assigned code 217. Each of the various activity codes was classified as either grade 12 or grade 13, depending on the underlying assets or gross receipts. Returns coded 217 (corporate) and 289 (non-taxable corporate) were grade 12, while returns coded 219, 221, 223, and 225 (corporate) and 290 (non-taxable corporate) were grade 13. Returns of a given grade were generally assigned to agents of the same grade. So, for example, a code 289 return from White Plains would have been assigned to a grade 12 agent whose POD was White Plains.

While the default rule was that returns of a given grade were assigned to agents of that grade, the IRS allowed agents to work on above-grade returns for training and development purposes. In the LMSB, Chillemi was allowed to assign an agent work above her grade level so long as less than 25% of the agent's time was spent on above-grade returns.[3] Such assignments were not mandatory, but if an agent requested above-grade work it could be assigned in three different forms: participating on a team headed by a higher-graded agent; assisting a higher-graded agent on a return; or working directly on a grade 13 return.

_____

[3] This cap was due to a provision of the collective bargaining agreement, which stated that any agent who worked on above-grade returns more than 25% of the time during a four month period would receive back pay at the higher grade for that period.

On September 13, 2000, Brown made his first request to Chillemi for above-grade returns, specifically noting that since joining LMSB group 1645 he had "not receive[d] any work for this program (LMSB)," and requesting that he receive "high grade LMSB cases 223 and 225 to be worked in conjunction with Revenue Agent Yves Gelin for career advancement purposes." (Kelley Decl. Ex. 34.) A second written request followed on September 19, in which Brown acknowledged that since his September 10 request he had received grade 12 returns coded 217 and 289, but had yet to receive any grade 13 returns. (Kelley Decl. Ex. 35.) In this second memorandum, Brown again requested grade 13 returns, specifically grade 13 returns coded 221 or higher. (Id.)

On September 20, after receiving this second request, Chillemi telephoned Karen King of the Equal Employment Opportunity Office ("EEO"). Chillemi read the September 10 and September 19 memoranda to King, told her that Brown specifically requested code 221 or higher returns, and told her that there were no such returns to be assigned in the group. (Wotorson Decl. Ex. 6.) King responded by telling Chillemi that he "must give to [Brown] the same work as [he] gave everyone else in the group." (Id.)

Following this conversation with King, Chillemi called Charles Vassallo, the manager of a group composed exclusively of grade 13 agents, to ask whether Vassallo had any extra grade 13 returns that Chillemi could assign to his group for developmental purposes. The next day, Chillemi received a 219 return and three 290 returns for general assignment, all of which were grade 13 returns.[4] The next day, on September 21, Chillemi gave Brown a 219 return and a 290

---

[4] Brown denies this assertion in part. (Pl. Rule 56.1 Stmt. ¶ 83.) Using the same denial discussed above in note 2, Brown denies that "On September 21, 2000, Chillemi received one 219 and four 290s from Mr. Vassallo." (Def. Rule 56.1 Stmt. ¶ 83.) However, Brown does *not*

return.

On September 25, Brown sent another memorandum to Chillemi, which acknowledged the assignment of the two returns on September 21, but complained that the returns were not coded 221 and above and that, in any event, they had "no significant issues." (Kelley Decl. Ex. 36.) Another memorandum followed on October 10, wherein Brown again complained of unfair treatment, and set an October 13 "deadline" by which Chillemi was told to "rectify [his] bias" or else Brown would "take [his] concern to the next level as prescribed by law." (Kelley Decl. Ex. 37.) On October 16, the deadline having passed, Brown met with an EEO counselor to discuss the situation. (Brown Decl. ¶ 11.) Brown filed his EEO complaint in March 2001 (Wotorson Decl. Ex. 14), and this action followed in October 2002.

## DISCUSSION

I. Exhaustion of Administrative Remedies

Brown's initial complaint in this action was filed *pro se*, and alleged failure to promote, harassment, hostile working conditions, and inferior work assignments. Brown v. Snow (Brown I), No. 02 Civ. 7985, 2003 WL 1907974, at *1 (S.D.N.Y. Apr. 17, 2003). Defendant moved to dismiss the complaint in January 2003, arguing that Brown failed to exhaust administrative remedies and that he failed to state a claim upon which relief could be granted. Before responding to defendant's motion, Brown retained his present counsel. This Court granted

---

deny that the "219 and three of the 290s were grade 13 returns for general assignment that otherwise would have been assigned to the grade 13 agents in [Vassallo's group]." (Id. ¶ 84.) Nor does he deny that the final 290 was assigned specifically to agent Gill, because it was related to a return on which Gill had previously worked. (Id. ¶ 86.) Therefore, it is unclear what Brown is denying with respect to paragraph 83 of defendant's Rule 56.1 statement. Defendant cites to evidence in the record showing that the returns were obtained on September 21 from Vassallo (see Chillemi Aff. ¶ 93), and Brown points to nothing that contradicts this evidence.

defendant's motion in part, dismissing Brown's claims of failure to promote, harassment, and

hostile working conditions, because Brown had failed to exhaust administrative remedies with

respect to those claims.  Id. at *1, *3.  At the time, the Court observed that "[t]he EEOC charge

here alleges only the failure to assign certain cases to plaintiff, and makes no mention of any

failure to promote Brown, of any harassment, or of any hostile working conditions.  Nor does it

allege facts that would support such claims."  Id. at *3.[5]

Nothing about the EEOC charge has changed since that statement was written almost

three years ago.  However, on May 12, 2003, with the assistance of counsel, Brown filed an

amended complaint alleging (1) that starting in June 2000, when Rinaldi became Brown's

second-level manager, he stopped receiving grade 12 work (Am. Compl. ¶¶ 8.d, 8.dd), (2) that

Chillemi did not assign him "higher-graded" returns for career development (id. ¶¶ 8.f, 8.dd), (3)

that on January 14, 2002, he was reassigned to a new division (id. ¶ 8.u), and (4) that he was

rejected or not considered for certain unspecified promotions (id. ¶¶ 8.y, 8.dd).

Not surprisingly, defendant now argues that Brown's claims, other than those regarding

the assignment of returns, should be dismissed for failure to exhaust administrative remedies,

pursuant to the arguments underlying this Court's opinion that initially dismissed those claims.

(Def. Mem. Supp. Summ. J. 24-25.)  Brown's response to this argument is relegated to a

---

[5] The Court also dismissed Brown's complaint "as to any conduct occurring prior to
September 1, 2000," because any such claim was time-barred.  Brown I, 2003 WL 1907974, at
*5.  The Court granted Brown leave to amend his complaint, which he has done, and stated that
if appropriate Brown's amended complaint may "include facts supporting a claim of 'practice or
policy' of discrimination," which would allow Brown to include conduct prior to September
2000 in this action.  Id.  For purposes of this motion, the Court will assume without deciding that
Brown's amended complaint does support a "practice or policy" claim, and that therefore he may
include allegations concerning conduct that occurred prior to September 2000.

footnote, in which he states: "To the extent that defendant argues that plaintiff has failed to exhaust his administrative remedies, we note that the Amended Complaint alleges that plaintiff's mistreatment is 'ongoing in nature.' Thus, plaintiff's Amended Complaint 'relates back' to his original EEO filing." (Pl. Mem. Opp. Summ. J. 19 n.8.) The argument is a non sequitur. A line in the complaint, describing the nature of the allegations in the complaint, does nothing to expand the relevant conduct at issue *in the underlying EEO charge*, nor does it excuse Brown from exhausting his administrative remedies with respect to claims *unrelated* to the conduct at issue in the charge.

Brown's argument is apposite to the extent that it applies to his claim of ongoing discrimination in the assignment of returns – discrimination after he filed his charge – since the assignment of returns was the subject of the underlying EEO charge. This claim would indeed "relate back" to the EEO charge, because such a claim would be presumptively "reasonably related" to the allegations in the charge. See Brown I, 2003 WL 1907974, at *5 & n.6; see also Alfano v. Costello, 294 F.3d 365, 381 (2d Cir. 2002) (noting that district courts have jurisdiction to hear claims under Title VII that are "reasonably related" to the conduct alleged in the EEO charge). Defendant does not argue otherwise. However, with respect to claims unrelated to the assignment of cases – such as his failure to promote claim – Brown's simple reassertion of those claims after they were dismissed in Brown I does nothing to undermine the justification for their initial dismissal.[6] Therefore, because the EEO charge "alleges only the failure to assign certain

---

[6] In his memorandum opposing summary judgment, Brown claims that he was subjected to negative "performance ratings." (Pl. Mem. Opp. Summ. J. 14.) This claim is neither in his complaint nor his EEO charge. Therefore, to the extent it was raised at all, it is also dismissed. In any event, this claim is severely undercut later in his memorandum, when Brown states that his evaluations were "consistently stellar." (Id. 25.)

cases to plaintiff, and makes no mention of any failure to promote Brown, [or any discriminatory reassignment,] . . . those claims must be dismissed." Brown I, 2003 WL 1907974, at *3.[7]

II. Summary Judgment Standard and Title VII Requirements

With respect to Brown's surviving claims, summary judgment shall be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue of material fact" exists if, based on the evidence before the Court, a reasonable jury could find in favor of the non-moving party. Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). In deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion," Cifarelli v. Babylon, 93 F.3d 47, 51 (2d Cir. 1996), and may not make any credibility assessments or weigh the evidence, Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).

To determine which facts are material, the Court must look to the substantive law that supplies the basis for the claims at issue. See Liberty Lobby, 477 U.S. at 248. Here, Brown alleges discrimination on the basis of race and national origin, and retaliation for prior protected activity. To make out a prima facie case of discrimination, Brown must show that (1) he is a member of a protected class; (2) he is qualified for his job at the IRS; (3) he suffered an adverse

_____

[7] The Court notes here, as it did in Brown I, that Brown's interest in obtaining higher-grade cases is "rooted in the potential for a promotion." 2003 WL 1907974, at *3 n.3. The relation between the assignment of returns and promotion opportunities will be discussed later in connection with the determination of whether the assignment of returns to Brown constituted an "adverse employment action" under Title VII.

employment action; and (4) the circumstances surrounding that action permit an inference of discrimination.  Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004); accord, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  With respect to his retaliation claim, Brown must show that (1) he participated in a protected activity about which defendant was aware; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action.  See Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004).

III.  Adverse Employment Action

To make a prima facie showing with respect to his discrimination claim or his retaliation claim, Brown must show that the alleged discriminatory or retaliatory actions he suffered were "adverse employment actions" under Title VII.  Not every action, or even every action motivated by prohibited animus, is an adverse employment action.  "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.  To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

Here, Brown alleges that his managers, Chillemi and Rinaldi, discriminated against him by not assigning him "work that was commensurate with [his] pay grade[]" (Am. Compl. ¶ 8.d), returns that would "qualify him for career development" (id. ¶ 8.f), and "higher graded cases" (id. ¶ 8.dd).[8]  More succinctly, Brown alleges that defendant "failed to assign grade 13 cases to

---

[8] Because Brown's other claims are dismissed for failure to exhaust administrative remedies, these allegations are the only adverse employment actions at issue.

him for career development purposes." (Pl. Mem. Opp. Summ. J. 10.)[9] As is made clear in his

briefing, however, Brown admits that defendant *did* assign him grade 13 returns. Brown's claim,

therefore, is more nuanced; it is not simply that he did not receive any grade 13 returns, but that

the "code 219 and code 290 [grade 13] cases which were eventually assigned to plaintiff

afforded him zero potential for career enhancement, since they demonstrably did not have any

audit potential." (Id. 24.) Brown does not claim that any specific grade 13 return should have

been assigned to him, or that any particular assigning decision was an adverse employment

action motivated by discrimination or retaliation. Nor does he challenge any particular failure to

promote him. Rather, Brown claims that from June 2000 onward, his portfolio of grade 12 and

grade 13 returns was somehow inferior to the portfolios of similarly situated members of group

1645, and he claims the creation of this difference in portfolio quality was an adverse

employment action.

There is no bright-line rule regarding when a work assignment constitutes an adverse

employment action under Title VII. Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d

Cir. 1997). "[S]ubjective dissatisfaction with assignments does not constitute adverse

employment action." Harrison v. New York City Off-Track Betting, No. 99 Civ. 6075, 2001

WL 1154691, at *3 (S.D.N.Y. Sept. 28, 2001); see also Morrison v. Potter, 363 F. Supp. 2d 586,

591 (S.D.N.Y. 2005) ("subjective feelings about a change in job duties do not transform a

---

[9] Brown alleges that in June 2000 he "stopped receiving work that was commensurate
with [his] pay grade[]." (Am. Compl. ¶ 8.d.) To the extent that allegation relates to grade 12
work, Brown has abandoned that claim by admitting that from September 2000 through June
2001 he had more grade 12 work than other agents in the group (Def. Rule 56.1 Stmt. ¶ 104), and
admitting that he had more work during the five months *after* June 2000 than he did during the
previous five months (id. ¶¶ 67-71).

reassignment into an adverse employment action"); <u>Castro v. New York City Bd. of Educ.</u>, No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("not everything that makes an employee unhappy is an actionable adverse action").  However, while an employee's preference for one assignment over another is not actionable under Title VII, an assignment may qualify as an adverse employment action if it results in "significantly diminished material responsibilities." <u>Galabya</u>, 202 F.3d at 640; <u>see also</u> <u>Little v. Nat'l Broad. Co.</u>, 210 F. Supp. 2d 330, 346 (S.D.N.Y. 2002) (reassignment to job with "undesirable shifts" and "erratic schedule" could be an adverse employment action).  "In the context of job transfers, the Second Circuit has suggested that employment actions resulting in assignments 'materially less conducive to career advancement' should be considered 'adverse employment actions.'" <u>Brown I</u>, 2003 WL 1907974 at *3, <u>quoting</u> <u>Galabya</u>, 202 F.3d at 641.  Put another way, "plaintiff must show that the transfer created a materially significant disadvantage." <u>Galabya</u>, 202 F.3d at 641.

In <u>Brown I</u>, the Court recognized this distinction between subjective evaluations of assignment quality on the one hand, and significant diminutions of material responsibilities on the other, by stating that Brown could satisfy the "adverse employment action" requirement by showing that "certain cases, which were not merely subjectively to his liking, but were objectively rated higher by the employing agency itself" were not assigned to him.  2003 WL 1907974, at *4.  As noted above, Brown is no longer advancing a claim that he was not assigned objectively higher-rated returns by defendant; he now claims that the mix of grade 12 and grade 13 returns he received during his employment was inferior to that of his coworkers.  To determine whether Brown has raised an issue of fact as to whether defendant's actions constitute an adverse employment action, this Court must "pore over" the record to determine whether the

evidence is sufficient to permit a finder of fact to conclude that defendant's assignment of cases to Brown represented a significant diminution of his material responsibilities, or materially diminished his opportunities for advancement.  Wanamaker, 108 F.3d at 466; see also Galabya, 202 F.3d at 640.  To successfully raise an issue of fact, Brown must produce sufficient evidence to show both the existence of defendant's alleged action, and the nature and extent of the effect of that action on Brown.

    A.  Evidence Regarding Brown's Work Assignments

Brown alleges that defendant assigned him returns inferior to those that were assigned to other agents in LMSB.  In support of this allegation, Brown provides the following evidence: (a) Chillemi's "admission" that he did not assign code 219 or code 290 returns to Brown before Brown's September 2000 memorandum requesting grade 13 returns (Pl. Mem. Opp. Summ. J. 23, see also Pl. 56.1 Stmt. *passim*); (b) Chillemi's failure to deny, in his September 20, 2000, conversation with Karen King, an EEO representative, that he was not assigning Brown the same returns as other agents in the group (Pl. Mem. Opp. Summ. J. 23, see also Pl. 56.1 Stmt. *passim*); (c) Brown's statement that the two grade 13 returns he was assigned in September 2000 "had no significant issues or audit potential" (Brown Aff. ¶ 9); (d) Brown's statement that "a disproportionate number of" his code 219 and code 290 returns "were not audit worthy" (id.); and (e) various reports that appear to show the returns Brown was assigned and how many hours he worked on those returns during certain months (Wotorson Decl. Ex. 67, 68).

The first two pieces of evidence relied upon by Brown – Chillemi's admission and his conversation with King – both relate to the period between June 2000, when Brown started in LMSB, and September 2000, when Brown received his first grade 13 return.  Defendant admits

that other agents received grade 13 returns prior to September 2000. (See Def. Rule 56.1 Stmt. ¶ 58.) A reasonable factfinder could conclude that Brown was not assigned grade 13 returns during the summer of 2000.

Brown argues, however, that with respect to his employment generally, and not simply during those four months, defendant did not assign him "workable higher grade cases like his white counterparts." (Pl. Mem. Opp. Summ. J. 23.) The next two pieces of evidence on which Brown relies are essentially his own evaluations of the quality of the cases he was assigned. Brown admits that he was assigned code 219 and code 290 returns after September 2000, but he claims that the returns he was assigned generally "afforded him zero potential for career enhancement." (Id. 24.) Specifically with respect to the first two returns he received in September 2000, Brown claims that they "had no significant issues or audit potential" (Brown Aff. ¶ 9). More generally, Brown asserts that the returns he was assigned were consistently less "workable" than the returns assigned to the other agents in LMSB. (Id.)

Brown's subjective belief that his collection of assigned returns was inferior to that of his coworkers is, by itself, insufficient to support a finding of adverse employment action. See Harrison, 2001 WL 1154691, at *3. To corroborate his evaluation regarding the comparative worth of his and his co-workers' returns, Brown points to one final body of evidence: an assortment of "Activity Count" reports and "100 Percent IVL" reports. (Wotorson Decl. Ex. 67, 68.) Brown's briefing does not explain what information these reports are supposed to contain, he fails to point to any evidence in the record explaining the nature of the reports, and he himself admits that he is uncertain exactly what the reports show. (Pantoja Reply Decl. Ex. 1.) In any event, the reports appear to contain the following information.

On October 20, 2000, Brown's report lists one code 219 return and one code 290 return, with zero hours credited to both returns, while other agents' reports credit them with more time and a greater number of grade 13 returns (with the exception of agent Caba, whose report indicates zero time credited to grade 13 returns). (Wotorson Decl. Ex. 67, at AWW000062 to 000068.) In March of an unknown year, Brown is credited[10] with one code 290 return while other agents, with one exception, are credited with a greater number of grade 13 returns. (Id. Ex. 67, at AWW000043.) On March 14, 2001, Brown's report indicates zero "Time Appl" for the only code 290 return listed, while other agents are credited with more grade 13 returns and more "Time Appl" associated with those returns. (Id. Ex. 67, at AWW000051 to 000055.) On June 20, 2001, Brown's report lists one code 219 return, with zero hours credited to it. (Id. Ex. 68, at AWW000250.) Lastly, one week earlier, on June 14, 2001, Brown's report lists no grade 13 returns, while once again other agents credited time to grade 13 returns. (Id. Ex. 68, at AWW000251 to 000258).

Brown provides no evidence about what the columns for "Time Appl" on the "Activity Code Inventory Reports" or for "Time" on the "100 Percent IVL Reports" actually measure. For example, the total of the values under the column labeled "Time Appl" in Brown's March 14, 2001, Activity Code Inventory Report is "526," but it is unclear what that 526 is supposed to mean. It would be hard to imagine that it indicates the total time worked during the previous

_____

[10] It is unclear from the report what the "1" in the column for "290" indicates. For example, the "1" could stand for the number of code 290 returns Brown completed during the previous month, or perhaps the number of code 290 returns he completed during the previous week; it could be the number of code 290 returns he was assigned during some period, or perhaps the total number of code 290 returns pending at a certain time. Furthermore, it is unclear which of these interpretations would be most favorable to Brown.

month, since if the units were hours Brown would have been working 130-hour weeks, and if the units were minutes he would have worked only 9 hours. The Court is left to assume that the numbers indicate some sort of time spent, and because all inferences must be made in Brown's favor, the Court will assume that a higher number indicates more work.

In addition to the evidence provided by Brown, the record contains reports for additional months which were produced by defendant and which Brown does not contest. These additional reports, which clearly measure time in hours, show that Brown worked eight hours on a code 219 return and ten hours on a code 290 return in October 2000 (Kelley Decl. Ex. 20, at US00335 to 00336); that Brown worked twenty-two hours on a code 290 return as of the end of November 2000 (id. Ex 20, at US02405); that Brown worked five additional hours on a code 290 return in December 2000 (id. Ex. 21, at US00333); that Brown worked twenty-four hours on a code 290 return in April 2001 (id. Ex. 24, at US00325); and that Brown worked twenty hours on a code 290 return in May 2001 (id. Ex. 25, at US00323). The record does not contain similar reports for the other agents in LMSB during the months at issue.

Brown himself provides further evidence of his work on grade 13 returns, in the form of a memorandum from an acting manager dated May 2003, which indicates that Brown charged more than 25% of his time to grade 13 returns in prior months. (Wotorson Decl. Ex. 38.) As previously stated, grade 12 agents are not allowed to work more than 25% of their hours on grade 13 returns.

Viewed in the light most favorable to Brown, the record shows that between June 2000 and September 2000 Brown was not assigned any grade 13 returns. Then, in October 2000,

Brown worked eighteen hours on two grade 13 returns,[11] while some other agents in LMSB had a greater number of grade 13 returns and worked some substantial amount of time on them. In the next several months, Brown worked almost thirty hours on grade 13 returns, while the number of hours worked by other agents is unknown. Then, in March 2001, Brown worked zero hours on grade 13 returns, while other agents worked some substantial amount of time on the grade 13 returns to which they were assigned. During the following two months Brown worked forty-four hours on grade 13 returns, while the hours worked by other agents are unknown. Then, in June 2001, Brown was assigned a grade 13 return at some point during the month, but did not spend any time working on that return. Finally, two years later, in May 2003, Brown received a memorandum from a manager indicating that he was working *too many* hours on grade 13 returns, and that Brown would need to transfer some returns to grade 13 agents.

Based on this evidence, a reasonable finder of fact could conclude that from June 2000 to September 2000 Brown was not assigned any grade 13 cases. A finder of fact could also conclude that in October 2000 and in March 2001, Brown spent less time, perhaps even substantially less time, working on grade 13 returns than did the other agents in LMSB. Brown's memorandum, however, contains allegations of discriminatory conduct from September 2000 to February 2004. Of the forty-five months during that period, the record contains evidence in only six that allows for a comparison between the time Brown and other agents worked on grade 13 returns – June 2000 to October 2000, and March 2001. There is no evidence in the record that

_____

[11] The report submitted by Brown indicates that he worked zero hours as of October 20, 2000. The report submitted by defendant indicates that Brown worked eighteen hours as of October 27, 2000. Because Brown does not dispute the accuracy of defendant's report, the record indicates that the eighteen hours at issue were worked between October 20 and October 27.

would permit a reasonable finder of fact to draw any conclusions or inferences regarding the other thirty-nine months, especially since the record contains evidence that Brown *did* work on grade 13 cases during October 2000, November 2000, December 2000, April 2001, and May 2001, and worked over 25% of his time on such cases at some point in 2003.

Based on this evidence, a reasonable fact finder could not infer that Brown was assigned returns inferior to those assigned to other agents throughout a nearly four-year period. At most, Brown has raised an issue of fact regarding returns that were assigned from June 2000 to October 2000, and in March 2001.

B. Effect on Brown's Conditions of Employment

To raise an issue of fact regarding whether Brown suffered an adverse employment action, Brown must not only produce evidence that defendant assigned him inferior returns, but he must also produce evidence from which a reasonable finder of fact could conclude that defendant's assignment of inferior returns resulted in a materially adverse change in the terms and conditions of his employment.

Brown argues that defendant's assignment of returns was an adverse employment action.[12] (Pl. Mem. Opp. Summ. J. 24.) Brown does not argue that the assignment of a grade 12 return instead of a grade 13 return, or the assignment of a less workable grade 13 return instead of a more workable grade 13 return, is in and of itself, regardless of effect, an adverse

_____

[12] Brown also argues that the existence of discriminatory or retaliatory animus could be inferred from the fact that he was not assigned any grade 13 returns until September 2000 and the fact that the grade 13 returns he was assigned were not "workable." (Pl. Mem. Opp. Summ. J. 23.) Even assuming such an inference could be made, the motivation behind defendant's actions is irrelevant in determining whether those actions were adverse employment actions, because the determination of adverseness focuses on the effect to Brown, not the motivation of defendant.

employment action.[13]  Instead, he argues that the assignment to him of allegedly inferior returns

had an adverse effect on his potential for promotions and career advancement.  (Id.)  To link his

allegation of inferior assignments to a material change in the condition of his employment,

Brown argues that the portfolio of returns he was assigned starting in June 2000 resulted in his

failure to be promoted from grade 12 agent to grade 13 agent.[14]

Brown offers only two pieces of evidence purportedly relevant to establishing this

connection: the fact that he has not been promoted to grade 13, and a comment on one of his

rejected promotion applications stating that his "experience in corporations appears minimal."

(Wotorson Decl. Ex. 37.)  Brown argues that this comment would allow a finder of fact to infer

that his failure to obtain a promotion was "a direct result of defendant's prior failure to assign

higher graded cases to plaintiff."  (Pl. Mem. Opp. Summ. J. 24.)

---

[13] While Brown does not raise the argument, it is worth noting that standing alone, a discrepancy between grade 12 returns and grade 13 returns would not likely be an adverse employment action.  Regardless of the grade of the returns he was assigned, Brown would have done exactly the same work in his capacity as a revenue agent.  As stated above, the difference between grade 12 and grade 13 returns is the asset base of the taxpayer, not the work performed by the agent.  Simply working on the returns of taxpayers with less money is not a material difference in the terms and conditions of employment.  See Morrison, 363 F. Supp. 2d at 590-91 (no adverse employment action where plaintiff's assignments were among the duties normally assigned to individuals in her position).  To be an adverse employment action, the assignment must "constitute a setback to the plaintiff's career."  Galabya, 202 F.3d at 641.  Therefore, Brown must show, and indeed he does attempt to show, a connection between the allegedly inferior returns he was assigned and his potential for career advancement.

[14] The denial of a promotion is unquestionably an adverse employment action.  However, Brown does not challenge the general failure to promote him, or the denial of any specific promotion, as discriminatory.  Brown's only remaining claim in this action alleges the discriminatory assignment of work.  Therefore, Brown must show that defendant's assignment of returns resulted in a material change in the conditions of his employment.  It is not enough for Brown to show that he was not promoted; he must show that defendant's assignment of returns materially impeded his promotion.

A reasonable finder of fact could not draw such an inference. The distinction between grade 12 and grade 13 returns is predicated on the underlying asset base of the corporate taxpayer. All returns of any grade in the LMSB division were corporate returns, and therefore there is no basis in the record for a finder of fact to infer that the comment regarding Brown's experience in corporations was related to any failure to assign grade 13 returns to Brown.

More generally, Brown argues that receiving more higher-rated returns would have improved his likelihood of obtaining a promotion simply based on the career development experience such returns would have given him. As a general matter, it is perfectly plausible that greater experience with more involved grade 13 returns would help an agent's advancement to some degree. Indeed, defendants admit that the very purpose of assigning the occasional higher-grade return is "career advancement." But a slight, speculative effect is not sufficient to support a finding of adverse employment action. Rather, to survive summary judgment, Brown must show that the effects of defendant's assignment decisions "significantly diminished [his] material responsibilities," Galabya, 202 F.3d at 640, or "created a materially significant disadvantage" to his career advancement, id. at 641.

With respect to promotion decisions, Brown provides no evidence regarding what effect, if any, an agent's portfolio of grade 13 returns has on an agent's potential for advancement. Defendant, on the other hand, has provided uncontroverted documents relating to one of Brown's promotion applications. These documents indicate that promotion decisions are made pursuant to a numerical calculation, with applicants receiving points based on manager evaluations, ratings from a panel of superiors, and employment award history. (See Kelley Decl. Ex. 64; see also Def. Reply Mem. Supp. Summ. J. 14 & n.5.) Brown provides no evidence linking any of

these factors to the adverse action for which he has raised an issue of fact: the assignment of fewer grade 13 returns and grade 13 returns that required less work.[15]  Similarly, nothing in the promotion-related documents provided by defendant permits an inference that an employee's combination of grade 12 and grade 13 returns, let alone the nature of his grade 13 returns, plays any role, much less a significant one, in the calculation of the score that determines promotion decisions.  On the record before the Court, there is insufficient evidence for a reasonable finder of fact to conclude that any speculative adverse effect on Brown's career advancement was significant or material.[16]

    To summarize, Brown apparently no longer contends that he was not assigned grade 13 returns.  In any event, a reasonable finder of fact would have to conclude, based on the evidence before the Court, that Brown *was* assigned at least some such returns, and actually worked on at least some of the grade 13 returns that were assigned to him.  While there is a genuine issue of

---

[15] Moreover, because Brown has presented evidence sufficient to raise an issue of fact as to discrimination only with respect to assignments made from June to September 2000 and in March 2001, the actual question is whether assignments of less advanced returns during these limited periods could result in a materially significant disadvantage to Brown's career prospects.

[16] In this regard, a comparison to claims of adverse employment actions resulting from negative evaluations is illustrative.  When an employee receives a negative evaluation, that evaluation represents a setback for the employee's career advancement to some degree.  However, a negative evaluation, standing alone, is not an adverse employment action unless the plaintiff offers evidence that the evaluation affected the terms and conditions of employment.  See Fairbrother v. Morrison, 412 F.3d 39, 56-57 (2d Cir. 2005).  The abstract or potential effects of a negative evaluation in and of themselves are insufficient to support a finding of adverse employment action.  Similarly here, while it would be reasonable to infer that Brown's advancement potential might have increased to some degree had he received more grade 13 returns, or even more "workable" grade 13 returns, there is no evidence in the record that the returns Brown was assigned actually *did* affect his promotion opportunities, or that under the system in place for making promotions, such assignments would have a predictable, tangible effect on his opportunities.

fact as to whether, at least during certain months, Brown was assigned fewer or less "workable" grade 13 returns than similarly-situated white agents, he has failed to produce sufficient evidence for a finder of fact to conclude that the particular grade 13 returns he was assigned, or the nature of the work he did in connection with those returns, materially disadvantaged his career advancement opportunities or significantly diminished his material responsibilities. Therefore, Brown has failed to raise an issue of fact regarding whether he suffered an adverse employment action in the assignment of returns. Because an adverse employment action is a required element of a prima facie case of retaliation or discrimination under Title VII, defendant is entitled to judgment as a matter of law.

## CONCLUSION

Brown has either failed to exhaust administrative remedies or failed to raise a genuine issue of material fact with respect to every claim in his complaint. Accordingly, defendant's motion for summary judgment (Doc. #24) is granted and the complaint is dismissed. The Clerk of the Court is respectfully directed to close the case.


SO ORDERED.

Dated: New York, New York
       March 13, 2006

                                          GERARD E. LYNCH
                                          United States District Judge